(88 South. 549).

No. 24140.

**HINTON et al. v. SMITH et al.**

In re HINTON et al.

(May 2, 1921.)

*(Syllabus by the Court.)*

1. **Estoppel** ⊜⊐90(2)—**Elements necessary to create contract by partial execution through estoppel stated.**

In order to convert into a contract that which was not a contract (because of potestative conditions and lack of mutuality), by partial execution, resulting in the estoppel of a party remaining silent as though acquiescing therein, it must appear that the act of execution was performed to the knowledge and advantage of such party, and at the expense of the performer, and that the latter was misled by the silence of the other.

2. **Estoppel** ⊜⊐90(2)—**Knowledge and opportunity to refuse acceptance necessary.**

A person cannot be estopped, in such case, by partial performance of which he has no knowledge and acceptance of which he is afforded no opportunity to refuse.

Ten actions by A. F. Hinton and others against W. B. Smith and others. Judgments for plaintiffs were reversed by the Court of Appeal, and plaintiffs pray for writs of certiorari or review. Judgments annulled, and judgments of district court affirmed.

J. Rush Wimberly, of Arcadia, and Hall & Bullock, of Shreveport, for applicants.

C. F. Davis, of Shreveport, and J. T. Reeves, of Arcadia, for respondents.

Statement of the Case.

MONROE, C. J. Relators, 10 in number, allege that they were plaintiffs in the suits Nos. 1304, 1305, 1306, 1307, 1308, 1309, 1310, 1311, 1312, and 1313, of the docket of the Court of Appeal, Second Circuit, in which, as lessors, they sued to annul certain oil and gas leases, on the ground that they were executed without consideration and upon potestative conditions; that they obtained judg-ments in the district court, which were reversed by the Court of Appeal; and that the judgments last mentioned are erroneous—

"in holding that the payments of the 29th of April, 1917, to the bank, as agreed to in the contract, were a compliance with the conditions upon which the lease, or the option, was to be extended, and that such payments had the effect, independently of any drilling stipulation, to prolong the contracts until the 1st of August, 1919," and "in holding that the deposit in bank of the rentals was payment thereof, thus removing the potestative conditions and rendering the contracts valid and binding, where plaintiffs had received no consideration for the exercise of such a right by defendants, were not obligated to accept the rentals, and promptly refused to do so, particularly in suits Nos. 1304, 1306, 1309, and 1313, where the rentals were deposited by assignees of the leases, in the Bank of Minden, to the credit of W. B. Smith and J. A. Waters, defendants, who made no tender thereof, or offer to pay the same to plaintiffs until several days after the time they were due under the terms of the contracts."

As the leases in question are identical in terms, save as to the names of the lessors, the acreage, and aggregate rentals to be paid and the banks in which the lessees were to deposit the same, and as the suits were consolidated for the purposes of the trial and of the appeals to the Court of Appeal, and are brought here for the review of the judgments of that court, as based upon the single opinion handed down, in the case bearing the above title, we shall, as a matter of convenience, use the singular number in referring to the contracts, save where (and unless) it becomes necessary to distinguish between them in the matter of their execution or nonexecution.

The Court of Appeal has incorporated in its opinion most of the provisions of the contract which express the obligations (supposing that any were assumed) of the lessees. The contract with the defendants in the above-entitled case, which we take as the type (mutatis mutandis) of the others, designates the Bank of Minden as the depository of the

rentals, and that bank is so designated in four other contracts; and the Bank of Ring-gold is so designated in the remaining five contracts.

Articles 1, 2, and 3 purport to grant, bargain, sell, etc., to W. B. Smith and J. A. Waters, styled "second party," their successors and assigns, all of the oil, gas, etc., under the described land, together with rights of ingress and egress, for the purposes of mining, operating, etc., and of removing machinery and improvements at will, reserving to the lessor ("first party") one-eighth of all oil produced and saved on the premises, with a provision for the payment of gas rentals—all, in the usual form. Articles 4, 7, and 9 are incorporated in the excerpt from the opinion of the Court of Appeal, which follows hereinafter. Article 5 reads:

"5. In case second party should bore and discover either oil, or gas, water or other minerals, then, in that event, this grant * * * shall be in full force * * * for 25 years from the time of the discovery and as much longer as oil, gas * * * may be produced in paying quantities."

Article 6 declares that the grant is not intended as a franchise, but as a sale, etc.; and article 8 provides for the payment of royalty in the event of the discovery of other minerals than oil or gas. The habendum, in article 9, runs in favor of "second party, its [their] successors and assigns, on the following conditions," which conditions are included in the excerpt from the opinion of the Court of Appeal, to wit:

"The obligations which the lessees assume are set forth in the following clauses:

4. "* * * Second party hereby obligates itself to begin operations for drilling of a well for oil, gas or other minerals and prosecute the same with due diligence on the above-described land within one year from this date; otherwise, this lease shall become null and void as to both parties; provided, that second party may thereafter prevent such forfeiture, from quarter to quarter, for four additional years, by paying to the first party the sum of $25.00 per quarter until such well is commenced; and it is agreed that the commencement of a well shall operate a full liquidation of all rentals under this provision during the remainder of the term of this lease, which payments can be made at Ringgold, La., Bank of Ringgold, or payable direct to first party."

(7) "It is further agreed * * * that, in case the second party shall bore and discover oil on any lease within five miles of this contract, then, and in that event, this lease is automatically extended for a period of one year from said date of discovery within which to begin drilling on the land herein above described."

(9) "The land herein leased being mineral territory, and being what is known as wildcat territory, it is contemplated that the said lessee will acquire a number of leases in the vicinity of said lands, under leases similar to the contract herein made, with the right to commence operations for drilling a well within a distance of five miles of the above land; and it is agreed that the obligation contained in paragraph 4 to drill a well which shall be entirely at the expense of the lessee, and without any expense or demand whatsoever on the lessor, shall stand in lieu of any cash payment for the first year of this contract, and shall maintain this lease in full force and effect for a period of one year from May 1, 1918, to May 1, 1919."

"The defendants [the statement of facts proceeds] transferred this lease, along with many others, to the Ardmore Oil & Gas Company, Incorporated, for $20,000, payable out of the oil produced out of the lands, and this company transferred it to W. W. Kelse, who assigned it to the Midway Oil Company.

"The testimony establishes the fact that the latter company began drilling a well for oil on one of the leases within five miles of the land here involved before the expiration of a year from the date of the lease and had bored to a depth of 200 feet.

"It is also shown that, prior to the end of the first year of the lease, in April, 1919, the Ardmore Oil Company paid to the defendants, at the Bank of Ringgold, or deposited to their credit, the amount stipulated in the fourth clause of the lease, for the purpose of keeping the lease alive for one quarter, and that plaintiff returned the check sent him by the bank."

Then follows the opinion, proper, from which we make the further excerpts:

"We do not think that the charge urged by plaintiff, that the lease contract is bad, for want of a valid consideration, is well founded. The chance of discovering oil on the land is a

legal consideration for its lease, for a reasonable time, where the lessee obligates himself to explore for oil, and this is particularly true of land in 'wildcat' territory, such as this land was. There can be no doubt, however, that, in the contract, as it was written, all of its conditions were potestative. The lessors [meaning lessees] did not obligate themselves absolutely to do anything. But it is contended on the part of the defendants that the drilling of the well, within five miles of the land, transferred the obligations into a commutative contract, upon the theory that a condition, potestative in the beginning, ceases to be so when performed in accordance with the contract. And the same contention is made with reference to the quarterly payment as above stated.

"We are unable to determine the effect of the beginning of a well, within five miles of the leased land, before the expiration of the year from the date of the contract. The stipulation on this subject (article 9 of the contract) is not clear by any means. It may be that it was intended as a substitute for article 4, which stipulates for a well on the leased land, but, if that is the case, then the only effect it could have would be to extend the life of the contract from the 1st of May, 1918, to the 1st of May, 1919, under the express terms of the agreement.

· "The quarterly payment, made by the Ardmore Oil Company to the lessors, or to the Bank of Ringgold for them, presents a much more serious matter. Neither the authority of the Ardmore Oil Company to make the payment, nor of defendants to urge it as a defense, is questioned by the plaintiffs' attorney. The contract provides:

" 'It is understood between the parties to this agreement that all conditions between the parties hereto shall extend to their heirs, successors, executors, administrators and assigns.'

"In addition to the above, the Ardmore Oil & Gas Company, Incorporated, expressly agrees, in the act under which it held, to 'carry out and comply with all the obligations of the original lease.' * * * The contract in this case bears two aspects—a lease and an option. Let us eliminate the lease, and assume that the defendants acquired nothing but the option to develop the land, during a period not longer than four years, upon the payment of 25 cents per acre, on the first day of each quarter, and that they bound themselves absolutely to make such payments; can there be any doubts that the contract would have been valid and binding on both parties? The obligation to pay not being absolute, the contract contained a potes-

tative condition. But it is well settled that a condition, potestative in the beginning, ceases to be so when it is performed in accordance with the contract."

In support of which propositions the opinion cites Anse La Butte Oil Co. v. Babb, 122 La. 427, 47 South. 754 (including Murray v. Barnhart, 117 La. 1027, 42 South. 489; Quaker Realty Co. v. Purcell, 134 La. 1022, 64 South. 894 [meaning, probably, Hudspeth v. Oil Co.] 134 La. 1013, 64 South. 891); Busch-Everett Co. v. Vivian Oil Co., 128 La. 886, 55 South. 564; and differentiates the case of Raines v. Dunson, 145 La. 540, 82 South. 690.

W. B. Smith, one of the defendants, testifies that "operation" had begun on a well located within five miles of the land of the defendant Watts on the 27th or 28th of April 1919, and that by May 26 following, when these suits were instituted, the drilling had progressed to a depth of 200 feet. Watts, one of the plaintiffs, testifies that there may have been some timber hauled to the site of the well prior to the date at which a certain check was sent to him (which was May 5), and that a derrick may have been begun, but that there was no derrick and no drilling there prior to that date. And there is no other testimony upon that subject. There was an attempt by defendant to show that money was deposited in the Minden and Ringgold Banks, to the credit of the plaintiffs, respectively, prior to May 1, 1919, as rentals for the quarter beginning on that day, but the evidence is unsatisfactory as to the character of the deposit in the Bank of Minden, and it is shown that checks drawn against the special account to credit of which the deposit was made, by a Mr. Jones or some one else, were mailed to plaintiffs some days later, and were returned by them. A deposit of the character mentioned appears to have been made in the Bank of Ringgold on April 30, but plaintiffs were not informed

of it for a week or two, and, when they were informed, gave immediate instructions that the money be returned, and have never accepted it.

### Opinion.

[1] We agree with our learned brethren of the Court of Appeal that "the lessors [meaning lessees] did not obligate themselves absolutely to do anything," from which it follows that the lessors were not obligated to do anything. The judgment brought up for review is based, then, on the theory that, though the lessees were under no obligation to pay the rental for an extension of the term of the so-called contract, which bound them to nothing, yet that, having paid the rental in accordance with the terms of the instrument, the payment operated to convert into a contract that which, prior to such payment, had not been a contract, and to bind the lessors as though it had been a contract from the beginning. It appears to us, however, that the theory, as applied, which is, in effect, merely the doctrine of equitable estoppel, by silence or acquiescence, lacks the foundation of fact requisite for its maintenance. The lessees, not being bound either to drill a well or to pay rentals, or to comply with any other stipulation of the supposed contract, and the lessors being equally free of obligation in that respect, the lessors were not expected to know whether the lessees were, at any time, attempting such compliance, and in fact, did not know, until after the events, that such attempts were being made. And, so far from remaining silent after they learned of them, they immediately gave it to be understood that they would accept no benefit from the lessees, and did not consider that there was any contract between them; and it was after that and after the money deposited in the bank had been returned or ordered to be returned that the lessees must have done most of the drilling that preceded the institution of these suits.

The rule in regard to estoppel in such cases is stated as follows:

"2. *Implied Misrepresentation* — a. *Silence in General.* To make the silence of a party operate as an estoppel the circumstances must have been such as to render it his duty to speak. It is essential that he should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and should have been misled into doing that which he would not have done but for such silence. In other words, when the silence is of such a character and under such circumstances that it would become a fraud upon the other party to permit the party who has kept silence to deny what his silence has induced the other to believe and act upon it, it will operate as an estoppel." 16 Cyc. p. 759.

In the instant case, those who were blamably, and apparently intentionally "silent," were the lessees, who, having paid nothing, obligated themselves to nothing, and, done nothing, suddenly, upon the last day of the term, stipulated in the writing between them and the lessors, assumed, without notice to the lessors, to take action whereby it is to be supposed they intended, or hoped, to impose upon them the obligations of a contract into which they had never entered; in other words, to create a contract for them, out of nothing, which would bind them and their lands, and possibly enrich the lessees, who put up nothing, to the extent of millions of dollars.

The difference, between the case thus presented and that of the purchase and sale of an option to exploit lands for minerals, in which the purchaser pays the whole price in cash, or part cash, and the balance in installments, quarterly or otherwise, is too plain to require elucidation.

[2] In this case, the supposed purchasers or lessees having assumed no obligation to pay the price, the lessors were under no obligation to receive it, were at liberty to refuse a tender, no matter when made, and could not be bound by a tender which afforded them no opportunity to refuse.

In the other case, each party binding himself to the execution of the contract, the one is as much bound to receive the price as the other is to pay it, and the obligation of each may be enforced, or the contract annulled (perhaps with damages) for nonperformance.

For the reasons thus assigned, it is ordered and decreed that the judgments of the Court of Appeal in the various cases numbered 1304, 1305, 1306, 1307, 1308, 1309, 1310, 1311, 1312 and 1313 of the docket of that court be annulled, and that the judgments therein rendered by the district court be now affirmed, at the cost of the defendants in all courts.